### West Chicago Street Railroad Company v. John Dwyer.

1. EMPLOYER AND EMPLOYE—*Employer's Duty.*—An employer is bound to use ordinary care to furnish to his employes reasonably safe machinery and appliances and a reasonably safe place to work in.

2. FELLOW-SERVANTS—*Gripman and Wrecking Crew.*—A gripman

and a wrecking crew in the employ of a street car company as a common employer are not fellow-servants.

3. Master and Servants—*Servants in Authority.*—A common master is responsible for the acts of a servant whom he sets in authority over other servants. And in obeying the orders of his superior when in the line of his duty, the employe is in law regarded as obeying the orders of his master.

**Memorandum.**—Action for personal injuries. Appeal from the Circuit Court of Cook County; the Hon. John Gibbons, Judge, presiding. Heard in this court at the October term, 1894, and affirmed. Opinion filed February 12, 1895.

Edmund Furthmann and Van Vechten Veeder, attorneys for appellant.

Barnum, Humphrey & Barnum, attorneys for appellee.

Mr. Justice Shepard delivered the opinion of the Court.

The appellee was a gripman in the employ of the appellant on the Madison street line of its cable road, in Chicago, and was injured while engaged in the performance of his duties as such gripman, on April 20, 1891. He had been in the service of the appellant since 1885, as a driver, until the cable system was put in operation, in 1890, and afterward as a gripman.

On the day of the injury, as he was operating his train, consisting of a grip car and one trailer, around the loop extending through various streets from the east end of the Washington street tunnel under the river and back to the tunnel, he observed, when going west on Randolph street near Fifth avenue, that something was dragging under the grip car, and he stopped his train. Until he stopped he did not know what the trouble was, but then looking, he discovered that one of the slide-bars, which was an iron plate, or beam, fastened to and underneath the car, was loose, and so told the conductor.

After consulting with the conductor, appellee decided to proceed gently with his train to a point a block or two dis-

tant where, at or just before the entrance to the tunnel was reached, a man named Smith, known as a "starter" for the appellant, was stationed, and he did so.

When the train arrived near to where Smith was stationed, it was stopped, and he was called by the appellee.

According to the testimony of the appellee, he told Smith that the slide-bar was loose and had dropped down, and that Smith ordered him to pull ahead to a man-hole, and sent a man to open the man-hole and go underneath to examine the car when it should arrive in place, and that he, Smith, then called, by electric signals at his command, a wrecking wagon and crew, belonging to appellant and in its employ; that the wagon and crew arrived, and the grip machinery, already partly raised, was hoisted up and suspended to a hook in the roof of the grip car; and that after the crew had got through with their work, Smith ordered a grip car which had followed with another train behind the train in question, to be hitched to the trailer of appellee's train, and to proceed, pushing his grip car and trailer ahead through the tunnel; that the grip machinery which had been suspended within the grip car, was hanging loose and liable to swing so as to injure passengers on the grip car, and that Smith ordered appellee to take hold of it to keep it steady.

Smith denied that he gave any orders to appellee, and denied that he had any authority to give orders of any kind in cases of broken machinery, but says that when appellee came along with his train appellee told him that his grip was out of order, and asked him, Smith, to call the wrecking wagon, which he did; but that beyond doing that he exercised no authority or direction whatever in the matter. He does, however, testify that he coupled the train that came up in the rear, to the trailer of appellee's train.

Just how extensive Smith's authority was as a "starter" is a matter concerning which there is considerable conflict in the evidence. It is not disputed but that he wore a uniform and a badge with the word "starter" on it, and was accustomed to giving orders to trainmen as they approached the tunnel, and his orders were accustomed to obedience; nor but that he was authorized to "space" the distance be-

tween trains in order that they should not be run too close together in the tunnel, and, to that end, that he had authority to stop and start trains, and to control gripmen and conductors in that matter. Beyond that, it can not be said with certainty what his authority, if any, extended to, although it is clear that he was actively engaged, as was probably his duty, in hastening such repairs as would enable the road to be cleared so that following trains might proceed on their route.

It was admitted that the wrecking wagon and crew were kept steadily in the employ of the appellant, and, if not clearly proved, it must be presumed from the evidence that the crew were capable mechanics, possessing all the qualifications necessary to repair disabled trains, to the extent, at least, of permitting them to cease being obstructions to the operation of the road, and to be reasonably safe for use.

Whether because of his duty, under the rules of the appellant, to remain in his appropriate place on his grip car until the end of the route had been reached, or because of the orders of Smith to stand in his box and steady the suspended grip machinery, the appellee did in fact resume his position in his usual box on the car, and stand there in the act of steadying the hanging grip machinery while his train was being pushed through the tunnel.

Thus standing and holding the grip machinery, and as the train was proceeding out of the western end of the tunnel, the appellee again observed the same sound of something underneath the car grating against or dragging over the iron covers to the man-holes between the tracks, and while his attention was being directed toward ascertaining what the trouble was, a sudden jerk or jar was given to the car and the handle to the track-brake, which was in its proper place, suddenly flew back and struck him in the forehead, occasioning the injuries for which the judgment complained of was recovered. This brake handle, when perpendicular, reached four feet five and a half inches above the floor of the car, and was of iron.

Immediately after the injury, the train was stopped and another examination of the grip car was made, and one of

the slide-bars was found to be out of place, and down. The slide-bar was then chained up and the train proceeded on its route without further incident.

It is not clear in just what manner the slide-bar, being loose, could have caused the brake to fly from its place in the direction of appellee, but from all the evidence it is impossible to discover any other cause for it, and it is fairly established by the evidence that the loose slide-bar, when hanging down, caught against the iron cover of a manhole, and was in some manner thrown against the track-brake, which, in turn, caused its handle to fly back and hit appellee.

Now, it is established that the appellant, as an employer, was bound to use ordinary care to furnish to appellee, its employe, reasonably safe machinery and appliances, and a reasonably safe place to work in. Libby v. Scherman, 146 Ill. 540.

Had the injury occurred during the passage of the train over the two or three blocks between the point where appellee first discovered that the slide-bar was loose and the point where Smith was stationed, and to which the wrecking crew was called, quite a different question would have arisen. It might there well have been held that appellee, knowing of the defect, assumed the risk of a further operation of his train.

We are inclined to think, from all the evidence, that Smith's authority extended so far as, after a defective car had been disclosed to him, to subject the trainmen as to its further operation through the tunnel to his direction.

All trainmen, and appellee in particular, had always been in the habit of obeying his orders as to when to stop and when to move ahead, and it was his duty to give orders in such matters, and it was the duty of trainmen to obey him. It would seem to be unreasonable to hold that, having such authority, and a disclosed defect having been made known to him, and he having taken steps to have the defect remedied, employes, accustomed to receive and obey orders from him, should be at liberty to question his authority concerning further proceeding through the tunnel.

The fact that it was his duty to stop and start trains, so that collisions and other obstructions in the tunnel might be avoided, would seem to imply authority to stop or advance disabled trains, at his discretion, in order to avoid like results from causes besides those incident to the running of trains too close together.

We do not regard it as material whether Smith actually uttered the orders to appellee to proceed or not.    There seems to be the greater weight of evidence that he did actually give appellee a verbal order to take his place in his grip car and go on with the train, but if he did not speak the words he exercised equivalent directions.    He, himself, testified that he coupled the trailer of appellee's train to the grip car that was behind; and it is certain that, thereafter, the appellee's train was obliged to proceed whether appellee was willing or not.    According to the rules of appellant under which the appellee worked, it was his duty to keep in the place assigned to gripmen during all the time his car was in motion.    So, between his duty under general rules and the position in which his train was placed by being hitched to another possessing all the motive power of the two trains, we can not easily conclude that appellee was in the exercise of any volition, short of quitting appellant's service, in standing by his car in the manner he did.

Moreover, the appellee was not a mechanic.    He had always worked for appellee either as the driver of a horse car or as a gripman, and after the wrecking crew had come, whether at his request or at the unsolicited call of Smith, and had taken possession of his car, with all the information he possessed as to the nature of the defect which they had come to repair or remedy, he had a right to believe in and rely upon their work as being sufficient to make the performance of his duty safe from the happening of accident for the cause which he had pointed out.

The wrecking crew were not fellow-servants with appellee.    Their duties were mechanical in kind, and as disconnected from his, as those of the builders of his car were. And their acts were the acts of the appellant.

The crew, on that occasion, was in charge and under the control of Mr. Gibbons, who, in testifying, described himself as "foreman of street railroad construction," and was presumably a competent mechanic upon whom appellee had a right to depend. After the car had been put in condition to proceed and the train had been attached to the grip car that pushed it, he boarded the grip car with the appellee and rode standing up through the tunnel, and was on board when the accident happened, and it was under his supervision that the slide-bar was chained up after appellee had been hurt. It does not appear from his testimony that he heard any sound as of the slide-bar dragging until at the moment that it caught the cover of the man-hole by which the accident was caused. After the train was stopped he found the cover under the fender of the grip car that was pushing the train, about twenty-five feet from the man-hole from which it came.

From the fact that he heard no previous sound it would seem as if there was no such warning of imminent danger as made it the duty of appellee to leave his post of duty or to signal the train to stop. And we think that his presence on the grip car should be considered as in the nature of an additional assurance, if other were needed, to the appellee, that the crew had done all that was necessary to make the appliances of the car secure against danger. Gibbons also testified that he rode through the tunnel because the grip car was disabled by the grip having been taken out; that he rode standing up on the floor of the car and leaning against the center post on the right side of the car, a few feet in advance of appellee, and was looking after the condition of the floor of the tunnel. Presumably if the man-hole cover had been raised or misplaced he would have observed it, but he saw nothing to warn him of danger.

It does not appear that the grip machinery, itself, was broken or out of repair, nor that it needed to be taken out except for the reason that it could not be safely operated with a loose slide-bar.

The inference from all the evidence is, we deem, con-

clusive that the accident was caused from the defective and loose slide-bar dragging and catching against the iron cover · of the manhole, and that the slide-bar was loose and dragging before the wrecking crew was called, and that the accident would not have happened if the slide-bar had been properly chained up by the wrecking crew before starting through the tunnel, in the manner it was done after the accident.

Upon the whole record we are of opinion that the appellee was not guilty of contributory negligence, and that even though Smith was not his superior officer, whose directions he was bound to and did obey, there was such negligence by the appellant, through its wrecking crew, as entitled the appellee to recover.

The case is essentially unlike that of Sack v. Dolese, 137 Ill. 129.

The verdict was for $9,000 which the appellee was required by the trial court to remit down to $7,000, and for that sum judgment was entered.

We would be better satisfied if the judgment were for a considerably less sum, in view of what appears to us to have been the extent of the injury sustained by the appellee, but we are not warranted, in view of the whole record, in disturbing the judgment on that account alone.

It is the judgment of the jury, when uninfluenced by prejudice or passion, and not the judgment of a reviewing court, which, under our law, is to determine what is compensation for personal injuries in actions of tort.

Here, we have the commendable exercise of judgment by the trial judge in requiring a remittitur from the verdict, of all that seemed to him, under the evidence, to be excessive, and although we might wish that the trial judge had extended his rightful power in a praiseworthy direction still further, we are not at liberty, without usurping the functions of others, to reverse a judgment for the sole reason that our sense of exact justice would be gratified by a judgment for a less amount.

The judgment will therefore be affirmed.